[Civ. No. 13012. First Dist., Div. One. Nov. 18, 1946.]

LOUIS T. CASARETTO et al., Plaintiffs and Appellants, v. J. D. DeLUCCHI et al., Defendants and Appellants.

Albert C. Picard and M. Anderson Thomas for Plaintiffs and Appellants.

Stern & Grupp for Defendants and Appellants..

PETERS, P. J.—This action was brought by Louis T. Casaretto, doing business as the Redwood Meat Co., against J. D. and L. J. DeLucchi, partners, doing business as Mount Davidson Market, on a common count for goods allegedly sold by plaintiff to defendants. The goods sold consisted of meats which were allegedly sold and delivered during the period May, 1943, to November, 1943. According to plaintiff's evidence he delivered $14,013.66 of meat during the period in question to defendants for which he received only $5,854.90, leaving a claimed balance of $8,158.76. The defendants in their answer denied all the material allegations of the complaint, and, in addition, by way of set-off and counterclaim, alleged that plaintiff had overcharged them some $7,000 on the deliveries made. The defendants also cross-complained not only against plaintiff but also against one Schroeter, the former manager of the meat department of defendants. The first count of the cross-complaint alleged the existence of a conspiracy between Schroeter and plaintiff by means of which the conspirators planned to deteriorate the value of defendants' market so that it could be purchased by or sublet to them at much less than its real value; that pursuant to this conspiracy when Casaretto would deliver meat to defendants' market, Schroeter, as defendants' manager would receipt for meat in excess of the amount delivered. It is alleged that this phase of the conspiracy resulted in a loss in operation of $6,493.50 and a loss of profits in the sum of $5,058.22, or a total damage of $11,551.72.

The second count of the cross-complaint alleged that during this same period the defendants and cross-complainants were registered with the O.P.A. as a retail meat market and had received from the O.P.A. an allotment of red points; that Casaretto, during this period, was illegally operating as a meat wholesaler; that pursuant to the conspiracy between these parties not only was less meat delivered than was called for by the tags, but Casaretto collected red points for such meat never delivered with the result that defendants overdrew their red point ration bank account; that as a result, defendants' place of business was closed down by the O.P.A.

to the defendants' damage in the sum of $15,000. There is also a claim for exemplary damages in the amount of $25,000.

Demurrers to the answer and cross-complaint were overruled, whereupon the cross-defendants answered denying the allegations of the cross-complaint, and the cause proceeded to trial before a jury. The jury rendered two verdicts, one covering the issues raised by the complaint and answer, and the other covering the issues raised by the cross-complaint and the answer thereto. Both verdicts were in favor of the DeLucchis. On the complaint the jury found in favor of defendants. On the cross-complaint the jury also found in favor of the DeLucchis, and fixed the damages, assessed against both parties, at $6,500. Judgments were entered accordingly. Casaretto moved for a new trial in both proceedings, and Schroeter joined with him in moving for a new trial on the issues involved in the cross-complaint. The trial court denied the motion insofar as the judgment in favor of the DeLucchis based on the issues raised by the complaint was concerned. On the motion relating to the issues raised by the cross-complaint and answer the court denied the motion on condition the cross-complainants consent to a reduction from $6,500 to $500. The cross-complainants refused to accept the reduction, so that this motion for a new trial was granted.

Plaintiff Casaretto has appealed from the judgment in favor of the defendants rendered on the issues raised by the complaint, while the DeLucchis have appealed from the order granting the new trial on the issues raised by the cross- complaint.

*Appeal by Casaretto*

Most of the contentions raised by this appellant are highly technical and none are meritorious. No objection is made to any instruction given or refused by the trial court. A considerable number of technical objections are made to the pleadings. ▮ For example, the DeLucchis in their answer to the complaint set up a counterclaim. In this pleading it is averred that "Defendants incorporate Paragraphs I, II and III of cross-complainants' cross-complaint filed in this action and make the same a part of this Answer as though herein set forth at this point word for word." The cross-complaint was filed the same day as the answer. Casaretto urges that this is faulty pleading, and that his demurrer to the

answer should have been sustained. It is urged that portions of a separate and distinct pleading cannot thus be incorporated by reference. Casaretto does not suggest how he was prejudiced by such a method of pleading. In fact, no prejudice could occur inasmuch as Casaretto had both the answer and the cross-complaint with its incorporated provisions before him. The function of pleadings is to inform the parties within reasonable limits of the nature of the action pending and the issues involved. It is not to create traps that will require a reversal for nonprejudicial errors. Incorporating by reference the allegations of a different cause of action of the same pleading is a well-known method of pleading. Although such method of pleading has sometimes been mildly criticized (*Green* v. *Clifford,* 94 Cal. 49, 52 [29 P. 331]) it has never been held to be reversible error. For the same reason, while incorporating the allegations of a separate and distinct pleading by reference may not be a commendable method to plead, it certainly cannot and should not be held to be reversible error where the opposing party has both pleadings before him.

A somewhat similar problem was involved in *Turney* v. *Collins,* 48 Cal.App.2d 381 [119 P.2d 954]. In that case the pleader in an amended answer and counterclaim incorporated by reference certain exhibits pleaded in the original answer. In holding that this was not error the court stated (p. 388): ''As the question here presented to us is open, we are of the opinion that there is not the slightest reason for holding that a pleading may not by reference incorporate an exhibit or allegation found in another pleading in the same case, even though the pleading has been superseded by such later pleading. Except in a case where a complaint has been filed and not served, or a new party is brought into the case after pleadings have been filed and served, the opposing parties have copies of the prior pleadings, and so have no need to be supplied again, either with allegations or exhibits set forth in earlier pleadings in the same case. Such a requirement would simply involve needles additional expense to a party, and moreover, it unduly encumbers the record.''

There is no merit to this contention.

█ It is next urged that the allegations of the counterclaim do not show that the counterclaim is based on the same transaction which is the foundation of plaintiff's complaint.

Without any analysis by appellant Casaretto, it is extremely difficult to understand his contention on this point. The complaint is for the price of meat allegedly sold and delivered by plaintiff to defendants over a pleaded period of time. The counterclaim is for overcharges allegedly made on the same meat by plaintiff in his sales to defendants over the same period of time. Thus, even if a counterclaim had to relate to the "same transaction" set forth in the complaint this pleading amply complies with such requirement. (See cases collected 23 Cal.Jur. p. 237, § 15.) But the complete answer to this contention is that since the 1927 amendment to section 438 of the Code of Civil Procedure "the sole requisites of a counterclaim are that it 'must tend to diminish or defeat the plaintiff's recovery, and must exist in favor of a defendant and against a plaintiff between whom a several judgment might be had in the action.' Under this amendment it is not necessary that there be any connection between the cause of action set up in the complaint and that which forms the basis of the counterclaim. (*Terry Trading Corp.* v. *Barsky,* 210 Cal. 428 [292 P. 474].)" (*Luse* v. *Peters,* 219 Cal. 625, 630 [28 P.2d 357]; see, also, *Bond* v. *Farmers & Merchants Nat. Bk.,* 64 Cal.App.2d 842 [149 P.2d 722]; *Robertson* v. *Maroevich,* 42 Cal.App.2d 610 [109 P.2d 708].) This contention is clearly without merit.

The next contention is equally technical, and is equally without merit. It is contended that the answer pleads "fraud" as a defense, and based on this contention it is urged that fraud was not properly pleaded and that such a defense converted the action into an equity action in which the jury's verdicts were advisory only and in which plaintiff was entitled to findings of the court. The allegation complained of is found in Paragraph IV of the third defense set forth in the answer in which defendants allege that plaintiff delivered them meat but "overcharged" defendants some $7,000. It will be noted that no attempt to plead fraud is found in this allegation. An overcharge could be based on mistake as well as fraud. Moreover, no affirmative relief was awarded the DeLucchis on their counterclaim. It is not the counterclaim of the DeLucchis that charges fraud but their cross-complaint against both Casaretto and Schroeter. There can be no doubt at all that the cross-complaint alleges fraud in detail and with particularity. Casaretto strenuously argues

that fraud is equitable in nature, and that since this equitable cause of action was pleaded it was error to try such issues with the legal issues. He contends that he was entitled to findings of the trial court on all equitable issues. There are a whole series of contentions made not necessary to enumerate, all based on the assumption that since the cross-complaint charges fraud that cause of action was necessarily equitable in nature, and that it was error to submit these issues to a jury.

These contentions are all based on the basic misconception that in all cases where fraud is pleaded the cause of action is necessarily exclusively within the jurisdiction of the equity court. ▮ Fraud is, of course, a peculiar object of equity jurisdiction, but where, as here, the only relief asked is for damages, where no equitable relief or remedies are invoked, and where the remedy for damages is not only adequate but speedy, the action is at law, and equity will refuse jurisdiction. Equity jurisdiction is not conferred by a mere charge of fraud made affirmatively or defensively. (See many cases collected and commented upon 10 Cal.Jur. p. 475, § 17; 10 Cal.Jur. p. 467, § 10; 19 Am.Jur. p. 65, § 42; 30 C.J.S. p. 383, § 49.) Here the cross-complaint asked only monetary relief. No equitable remedy or right was invoked. This being so, the entire cause was legal in nature and it was proper, therefore, to submit all issues to the jury.

▮ Casaretto also contends that certain evidence offered by the DeLucchis concerning their difficulties with the O.P.A. was admitted erroneously and to his prejudice. In his brief the only example of such testimony referred to is a series of questions asked Casaretto as to whether he had any conversations with the DeLucchis in which he was advised that the DeLucchis had been called before the O.P.A. because of a red point shortage. This evidence, and the other evidence relating to the red point shortage, was clearly within the issues raised by the cross-complaint. The questions, therefore, were not incompetent, irrelevant and immaterial, these being the objections made to them.

▮ It is next contended that the verdict on the issues raised by the complaint and answer and counterclaim is in conflict with the pleadings and the stipulation of the parties. Casaretto points out that he sued the defendants for $8,805.19 and that the DeLucchis in their counterclaim alleged that

they were overcharged $7,000. It is therefore argued that on the basis of these pleadings the DeLucchis admitted a liability of $1,805.19 to Casaretto, and yet the jury awarded him nothing. This argument conveniently overlooks the allegations of the answer filed by the DeLucchis. The answer specifically denied that the DeLucchis owed plaintiff anything. The answer prayed "that plaintiff take nothing by reason of his complaint." The alleged overcharge of $7,000 was only to be considered an offset if the court found the DeLucchis owed Casaretto some sum of money. The verdict was clearly responsive to the issues.

The contention that the DeLucchis stipulated during the trial that they had received all items of meat listed on the bill of particulars with the exception of an overcharge of $755.80 is without merit. A reading of the long record demonstrates that at all stages of the trial, both before and after the stipulation in question was entered into, the DeLucchis were strenuously contending that much of the meat listed in the bill of particulars had never been delivered. The stipulation in question was never treated during the trial as an admission by the DeLucchis that they had received the meat listed. All that the stipulation amounted to was to summarize the bill of particulars and to agree upon the poundage claimed by Casaretto. The exact words of the stipulation were that the "total poundage of beef we find from the bill of particulars delivered over the period of time or alleged to be delivered," etc. (R.T. 544.) And again, "Total pounds of meat delivered, according to the bill of particulars," etc. (R.T. 545.) Such a stipulation cannot be distorted into an admission that the DeLucchis had no defense at all to the cause of action pleaded in the complaint.

It is also urged that the verdicts and judgment are contrary to the evidence. It is very difficult to understand this contention. The evidence most favorable to the DeLucchis on both the issues raised by the complaint and cross-complaint shows the following facts: Casaretto's place of business was Redwood City where he operated a retail meat market. He had no wholesaler's permit but his bill tags listed him as a wholesaler. The DeLucchis operated a large market in San Francisco, and in this market was a retail meat department. In November of 1942 Schroeter was hired by the DeLucchis as manager of their meat department. As such manager it was

the duty of Schroeter to buy all meat for his department, to compute the red points for such purchases and to manage generally the department. When Schroeter was first hired the DeLucchis had been buying meat from various wholesalers. Shortly after Schroeter was hired meat became quite scarce and Schroeter experienced some difficulty in securing meat for his department. Schroeter was an old friend of Casaretto. Casaretto apparently secured quite a lot of meat, particularly beef. In April or early in May, 1943, Schroeter introduced Casaretto to the DeLucchis, and Casaretto agreed to furnish meat to the DeLucchis through Schroeter. The arrangement was a most peculiar one. Casaretto sold the beef to the DeLucchis at the same price he paid for it—the wholesale price. This was done in violation of governmental regulations, Casaretto not being a wholesaler. This fact, however, he never disclosed to the DeLucchis. Thus the beef, according to Casaretto, was sold without a profit, in fact, at a loss. This is so because Casaretto absorbed the cost and expense of delivery, shrinkage, bookkeeping costs, credit costs, etc. The reason offered at the trial to explain this somewhat unusual course of conduct was that Casaretto was able to get all the beef he wanted and he desired to keep up his allotments with the wholesalers. This explanation, however, was not given in any of the several O.P.A. hearings held prior to trial. However, there was evidence that Casaretto was always short of meat and frequently sought more cattle. He did charge the DeLucchis more than the wholesale rate, but less than the retail rate, for meats other than beef. The DeLucchis, however, had no knowledge that they were being charged more than the wholesale rate for lamb and other nonbeef meats. The largest amount of meat delivered, however, according to the bill of particulars, was beef.

Between the period May to November, 1943, Casaretto delivered large quantities of meat to the DeLucchis under this arrangement. Schroeter, being the purchasing agent for the DeLucchis, gradually saw to it that practically all the meat for the DeLucchis' market was purchased through Casaretto and the allotments with the various wholesalers were allowed to lapse.

When Casaretto delivered meat to the DeLucchis' market he would always deliver the same to Schroeter who would weigh the meat and sign a tag for it. Casaretto would give the original tag to Schroeter and keep a copy for himself. Casa-

retto or Schroeter figured out the red points required, and Schroeter drew an order for the amount of points involved.

The theory of the DeLucchis was that Schroeter would sign for a greater poundage of meat than was actually delivered. This had several results. It made the operation of the meat market unprofitable, so that, according to the DeLucchis, Casaretto and Schroeter could purchase the market from the DeLucchis for less than its true value. There is evidence that Casaretto tried to sublet the meat market at a very low monthly rental. Such practices also resulted in Casaretto receiving more red points than he was entitled to, thus depleting the DeLucchi stock of red points. Direct evidence was offered by the DeLucchis that as to at least two deliveries improper practices were indulged in by Casaretto. Thus evidence was offered relating to a delivery supposedly made on August 9, 1943. This load, contrary to the usual custom, was not delivered by Casaretto but was picked up in Redwood City by an employee of the DeLucchis, Scheppleman by name. Scheppleman testified that he signed for the meat in Redwood City and brought a signed copy of the receipt tag back with him to San Francisco; that this tag was made out for either 3,255 or 3,235 pounds of meat; that he arrived back at the DeLucchis' market at about 6 p. m.; that Schroeter had left and that he and the DeLucchis weighed the meat and found a shortage; that the actual weight was 3,001 pounds. Both Scheppleman and Joe DeLucchi testified that a note was left for Schroeter to check this delivery and they left the duplicate tag with the note; that this was the last they ever saw of the Scheppleman tag. Casaretto offered in evidence a tag for this delivery which is signed by Schroeter and which states that 5,600 pounds of meat were delivered on that date. Strangely enough, this Schroeter tag is dated August 8th, which was a Sunday. As to this delivery, if the testimony offered by the DeLucchis was believed, as apparently it was, there was an overcharge of some 2,600 pounds. During the months here involved this was apparently the only delivery checked by the DeLucchis as to the weight claimed delivered, as this was otherwise left entirely in Schroeter's hands.

There was also some peculiar circumstances surrounding an alleged delivery of meat on November 2, 1943. The tag offered by Casaretto to support this delivery was a duplicate

tag signed by Joe DeLucchi, who signed it at the request of Casaretto who claimed that the original tag signed by Schroeter had been lost. At first Joe DeLucchi refused to sign this tag because he did not know whether he had received the meat, but Casaretto presented him with a bill of sale of the San Mateo Meat Company, wholesalers, showing that Casaretto had purchased the alleged meat from them that day. Upon this showing Joe DeLucchi signed the tag. At the trial the evidence offered by the DeLucchis demonstrated that Casaretto had not bought the meat in question from the San Mateo Meat Company until November 3, 1943, and that the tag had been altered not only as to the date but as to the price paid by Casaretto for this meat. The DeLucchis had been suspended by the O.P.A. on the morning of November 2, 1943, and prohibited from buying any more red point items. The DeLucchis claim, therefore, that they could not possibly have purchased this meat on the third, and that this whole alleged sale, totalling 1,742 pounds of beef and 258 pounds of lamb was a fraud. Casaretto and Schroeter testified that the meat was actually delivered on the third, and that the date was changed to the second at Joe DeLucchi's request to make it appear that the meat had been purchased before the O.P.A. suspension became effective. This was denied by Joe DeLucchi. This conflict in the direct and inferential evidence was resolved against Casaretto by the jury.

The DeLucchis offered some corrobative evidence that demonstrates that something was very wrong with the meat department from May to November, 1943. They showed that from January 1, 1943, to May 28, 1943, the meat market made a net profit of $2,340.62. This was before the dealings with Casaretto began. From May 29, 1943, to November 28, 1943, the meat market lost $6,597.39, although the amount of sales increased during this latter period. The records show that if Casaretto's figures are correct, $90.68 more was actually charged during this period for meat than was taken in on sales. There was evidence that meat bought at wholesale ceiling and sold at retail ceiling would net the retailer between 30 to 33⅓ per cent profit.

There were also some other facts testified to from which the jury could and apparently did indulge in inferences unfavorable to Casaretto. It was shown that, although Casaretto and Schroeter had known each other for fifteen years, it was not until after May of 1943 that they became intimate.

friends. Schroeter spent much time visiting at Casaretto's house and lived there on several occasions. At the time of trial Schroeter was working for Casaretto. Casaretto loaned Schroeter $300 to make a down payment on a house Schroeter was buying. This supposed loan was not evidenced by any records, and no entry was made in the books of the Redwood Meat Company, although the check was drawn on the account of that company. This "loan" was repaid in February, 1944, without interest, after the DeLucchis had discovered their red point shortage and while the DeLucchis were investigating the matter. Detailed and careful records were made out by the parties as to the repayment.

The books of Casaretto were in a somewhat questionable condition. At the trial a ledger sheet of the DeLucchi account was introduced. The entries thereon were not always in rotation by dates. Thus there would be an entry like May 6th following an entry of June 3d. Casaretto tried to explain this anomalous situation but the sufficiency of his explanation was for the jury. Moreover, both Joe DeLucchi and his bookkeeper testified that while investigating the red point shortage they checked Casaretto's accounts and were told that no ledger sheet of their account was kept.

The evidence also shows that on November 2, 1943, the O.P.A. forbade the DeLucchis from purchasing any more red point items because of a huge red point shortage of about 88,000 points. Subsequently, the meat market was suspended for a year. Obviously, if Casaretto overcharged the DeLucchis as to poundage and received red points based on the overcharges, it would deplete the DeLucchi supply of red points.

It is quite clear that the above evidence, plus the reasonable inferences therefrom, sustains the finding of the jury that Casaretto did not sustain the burden of proof of showing what meat had in fact been delivered. The judgment based on the verdict is amply supported and should be affirmed.

*Appeal by the DeLucchis from the order granting a new trial to Casaretto and Schroeter on the judgment for $6,500 based on the issues raised by the cross-complaint.*

Casaretto and Schroeter contend that the order is not appealable because, so they claim, the action was equitable in nature, and jury trial was therefore not a matter of right.

The 1945 amendment to section 963 of the Code of Civil Procedure permitting appeals from orders granting a new trial in equitable actions was not effective when this order was made. The answer to this contention has already been given in discussing the appeal by Casaretto. The action was legal in nature, the relief asked was legal, the legal remedy was adequate, and the parties were entitled to a jury trial as a matter of right.

The motion for a new trial on the judgment based on the issues raised by the cross-complaint was made on the ground of excessive damages, insufficiency of evidence and errors in law occurring at the trial. The trial court, it will be remembered, granted this motion for a new trial unless the DeLucchis agreed to a reduction in damages from $6,500 to $500. The trial judge did not specify insufficiency of the evidence as a basis of his order, so that that ground must be disregarded. (Code Civ. Proc., § 657.) No ground at all was specified as the basis of the order. It is obvious, however, that the basis of the order granting the new trial must have been excessive damages in view of the provision of the order that if the DeLucchis would accept a reduction to $500 the motion would be denied. However, the trial court's power in this respect is much more limited than it is when the order is based on insufficiency. Section 657, subdivision 5, of the Code of Civil Procedure, provides that a new trial may be granted on the ground of ''excessive damages, appearing to have been given under the influence of passion or prejudice.'' A new trial may not be granted on this ground merely because the verdict seems large, but only when it appears to have been given under the influence of passion or prejudice. The trial court may interfere with the verdict on this ground only where the verdict is so disproportionate to any reasonable limit of compensation warranted by the facts as to shock the sense of justice. Thus if the evidence before the trial court is conflicting, and there is substantial evidence to sustain the award, no right to grant a new trial on the ground of excessiveness of the verdict exists where insufficiency of the evidence is not also specified as a ground of the order. These principles are all well settled. (See cases collected 20 Cal.Jur. p. 99, et seq., § 64, et seq.)

Tested by these standards the evidence produced by the DeLucchis amply supports the award of $6,500. As al-

ready pointed out, the evidence shows that the DeLucchis should have made a gross profit of between 30 to 33⅓ per cent on all meat sold. From May to November the net loss of the meat market was $6,597.39. They should have made a net profit of nearly $2,000. Thus, as to this item of damage alone they were damaged in excess of $8,400. Casaretto and Schroeter attack these computations by pointing out that the DeLucchi records made it extremely difficult to know whether charges were made against the meat or grocery departments. However, the bookkeeper of the DeLucchis explained the books in detail.

In addition, as a result of the loss of red points the De-Lucchis were first forbidden by O.P.A. to purchase red point items, and then their meat department was completely suspended for a year. Thus, they were deprived of prospective profits in excess of the amount of the award. .

Casaretto and Schroeter strenuously argue that they cannot be held responsible for the red point shortage because red point items were sold by the grocery department of De-Lucchis' as well as the meat department, and but one red point bank account was maintained for both departments. The son of Schroeter who worked for the DeLucchis in the grocery department testified that he delivered many red point items to customers on DeLucchis' orders without securing red points. He named the customers he claimed who had been so favored. Practically every customer named was called as a witness and categorically denied the statements of young Schroeter. The other evidence on this point has already been reviewed. Obviously, if Casaretto overcharged on poundage he depleted the red point bank. The jury was entitled to infer that the deficiency in red points was caused by Casaretto and Schroeter.

It is obvious, therefore, that there is ample, substantial and credible evidence in the record to sustain a much more substantial award than the $6,500 fixed in the verdict. It is equally clear that under such circumstances the trial court was without power to grant a new trial on the ground of excessiveness of the damages.

It will be noted that the notice of motion for a new trial also specified errors of law. Under the rule announced in *Scott* v. *Renz*, 67 Cal.App.2d 428 [154 P.2d 738], it is necessary to search the record and to demonstrate that no error of

law was committed during the trial which would justify the order granting the new trial. The entire record has been read. Considering the length of the trial but few objections to evidence were made. All rulings by the trial court on admissibility of the evidence were correct. No claim is or can be made that any instruction given to the jury was erroneous.

The respondents Casaretto and Schroeter claim that the cross-complaint does not state a cause of action, and that their demurrer and supplementary demurrer thereto should have been sustained. It is urged that the allegations of the cross-complaint fail to show that the relief sought relates or depends upon the transaction upon which the main action was brought as required by section 442 of the Code of Civil Procedure. The point lacks merit. The Casaretto action was for the price of meat alleged to have been delivered. The cross-complaint charges Casaretto and Schroeter with a conspiracy to defraud on the weight of the beef delivered. Obviously, the cross-complaint relates to the same transaction set forth in the compaint.

It is also contended that Schroeter was never properly made a party to the action. Schroeter was brought into the proceeding by the cross-complaint. The order making him a party was secured by DeLucchis' counsel ex parte without notice to Casaretto. It is urged that this rendered invalid the proceedings based on the cross-complaint. It is of course the law that a new party cannot be brought into the proceedings by a defendant without an order of court. (*Alpers* v. *Bliss,* 145 Cal. 565 [79 P. 171].) That same case decided that if such an order is secured ex parte it may be vacated upon proceedings had under section 937 of the Code of Civil Procedure. The law is well settled that section 937 is applicable only to such orders as a court or judge has power or jurisdiction to make without notice. (See cases collected 18 Cal.Jur. p. 672, § 23.) Thus the holding of the Alpers case is necessarily predicated upon the assumption that the court has jurisdiction to bring in a new party by an ex parte order. No proceedings under section 937 of the Code of Civil Procedure were here instituted.

The contention that Schroeter was not a party whose presence was necessary to a complete determination of the controversy as required by section 389 of the Code of Civil Procedure is so clearly without merit that the mere statement

of the proposition carries its own refutation. The evidence already cited determines how necessary Schroeter's presence was to settle the controversy raised by the cross-complaint. (See cases collected 21 Cal.Jur. p. 82, § 52.)

Casaretto and Schroeter also claim error in the action of the trial court in granting the DeLucchis' motion to strike their demand for a bill of particulars. The cross-complaint was not based upon an account, but was an action for damages for a conspiracy. No claim based on contract was invoked and no specific demands were made against Casaretto and Schroeter. Under such circumstances no bill of particulars was necessary within the meaning of section 454 of the Code of Civil Procedure. (See cases collected 1 Cal.Jur. p. 157, § 18.)

There was no possible error of law that has been suggested by Casaretto or Schroeter or that we have found that supports the order granting the new trial.

The judgment in favor of the DeLucchis based on the issues raised by the complaint and answer is affirmed; the order granting a new trial on the issues raised by the cross-complaint is reversed.

Ward, J., and Schottky, J. pro tem., concurred.